STATIC CONTROL COMPONENTS, INC., Plaintiff/Counterclaim Defendant,

v.

LEXMARK INTERNATIONAL, INC., Defendant/Counterclaim Plaintiff,

v.

NER Data Products, Inc., et al., Counterclaim Defendants.

Nos. 5:02–571, 5:04–84.

United States District Court, E.D. Kentucky, Central Division at Lexington.

April 24, 2007.

Mark T. Banner, Timothy C. Meece, Binal J. Patel, Matthew P. Becker, Jason S. Shull, Michael L. Krashin, all of Banner & Witcoff, Ltd., Chicago, IL, Steven B. Loy, Hanly A. Ingram of Stoll Keenon Ogden PLLC, Lexington, KY, Andy Copenhaver, Hada Haulsee of Womble Carlyle Sandridge, Winston Salem, NC, for Defendant/Counterclaim Plaintiff Lexmark International, Inc.

## ORDER

VAN TATENHOVE, District Judge.

Lexmark International, Inc.'s ("Lexmark") Motion for Summary Judgment of Direct Infringement of Nine Patents Against the Remanufacturers is before the Court for consideration. [R. 519]. For the reasons set forth below, Lexmark's Motion will be granted in part and denied in part as follows: Lexmark breaks its motion down into three constituent elements of the cause of action of patent infringement. First Lexmark argues that the nine patents on which it bases its claims of infringement are valid.[1] Given an absence in the record of evidence to the contrary, the Court agrees.

Second, Lexmark seeks judgment that its single-use restriction on its cartridges, labeled on its cartridges and cartridge packaging, is valid and/or enforceable. Concerning this issue of Lexmark's single-use restriction, referred to by Lexmark as its "Prebate Program" or "Lexmark Return Program," Static Control Components, Inc. ("SCC") filed a topically-related Motion for Partial Summary Judgment that There are No Prebate/Return "Contracts" Because Lexmark Cannot Show any Meeting of the Minds. [R. 511]. The Court will begin its analysis of Prebate, *infra*, from the cast of SCC's Motion and ultimately deny that Motion. For the reasons set forth below, Lexmark is entitled to judgment on the validity of its single-use restriction, Prebate terms.

Finally, Lexmark seeks judgment on direct infringement of the nine patents by the Counterclaim Defendant remanufacturers, Pendl Companies, Inc. ("Pendl") and Wazana Brothers International, Inc. d/b/a Micro Solutions Enterprises ("MSE"), under 35 U.S.C. § 271(a).[2] Lexmark alleges two independent bases for

---

1. These patents are U.S. Pat. Nos. 6,487,383; 6,459,876; 6,009,291; 5,875,378; 5,802,432; 5,768,661; 5,758,233; 5,995,772; and 5,634,169.

2. NER Data Products, Inc. is and/or was additionally a Counterclaim Defendant remanufacturer in this action; however, NER and Lexmark have reached a settlement regarding Lexmark's claims against NER, and their motion for the Court to enter a consent judgment is currently pending with opposition from the other parties. [R. 917, 922].

infringement. Lexmark's first theory of infringement on which it seeks judgement is that the remanufacturers infringe upon its nine patents by the remanufacture, use, offer to sell, and sale of single-use only Prebate cartridges. Lexmark's second theory is that the remanufacturers infringe upon its nine patents by the importation, remanufacture, and sale within the United States of any toner cartridge, labeled Prebate or not, first sold by Lexmark outside the United States. While this second theory has been referred to as the *Jazz Photo* theory of patent infringement, referring to the Federal Circuit case pertaining thereto, the Court has also coined it the "overseas theory of patent infringement." *Jazz Photo Corp. v. Int'l Trade Comm'n,* 264 F.3d 1094, 1105 (Fed.Cir.2001). It is on this ultimate adjudication of infringement on either of Lexmark's two theories that Lexmark's motion will be denied.

In this Order, the Court additionally takes up other various pending motions that topically fit into the Court's analysis of direct patent infringement. These motions are as follows: SCC's Motion for Summary Judgment for Non–Patentability and Invalidity of Lexmark's Design Patents [R. 488]; Pendl and MSE's Motions for Summary Judgment of Permissible Repair [R. 523 (Pendl) ], [R. 565(MSE) ]; SCC's Motion for Summary Judgment to Preclude Lexmark International, Inc. from Enforcing its Patents Because of Lexmark's [Alleged] Patent Misuse [R. 520]; Pendl's Motion for Partial Summary Judgment of Non–Infringement of Replacement Photoconductive Drums [R. 521]; and MSE's Motion for Partial Summary Judgment of Non–Infringement of Replacement Photoconductive Drums and of Non–In-

fringement of Lexmark's '025 Patent [R. 562].

## I. BACKGROUND

Briefly, the status of the parties is as follows: Lexmark is a large producer of printers and toner cartridges for its printers. SCC is "a leading supplier to toner cartridge remanufacturers."[3] [R. 172 at 16, Case No. 5:02–571]. The remanufacturers, which include the other counterclaim-defendants in this case, take used toner cartridges, repair them, refill the toner, et cetera and resell the cartridges to end-user consumers. SCC sells to the remanufacturers parts and supplies for reworking the used toner cartridges, such as replacement parts, toner, and microchips. [R. 1].

Lexmark and SCC first began litigation in this Court in 2002 when Lexmark filed suit against SCC, alleging, *inter alia,* that SCC's sale of "SMARTEK" microchips infringed on Lexmark's copyrighted "Toner Loading Programs." [R. 1, Case No. 5:02–571]. In 2004, SCC filed a declaratory judgment action, alleging, *inter alia,* that its new "re-engineered" microchips did not infringe on any of Lexmark's copyrights. [R. 1, Case No. 5:04–84]. The cases were ultimately consolidated with Case No. 5:04–84 as the lead case, and all citations in this Order refer to that lead case unless otherwise noted. [R. 140]. Lexmark filed a Counterclaim/Third Party Complaint to the 2004 litigation initiated by SCC, in which it alleged patent claims against SCC and the Counterclaim Defendant remanufacturers to this case. [R. 67]. These patent claims in Lexmark's Counterclaim are the basis for its current motion for summary judgment.

**3.** Although Lexmark's current Motion specifically regards its direct patent infringement claims against the remanufacturers, SCC has an interest in opposing this Motion: direct

infringement by the remanufacturers is a predicate element to establishing Lexmark's claim against SCC of "active inducement of patent infringement." [*See, e.g.,* R. 657].

The primary, though not only, theory on which Lexmark alleges direct patent infringement against the remanufacturers and active inducement of patent infringement against SCC is predicated on Lexmark's use of single-use restrictions on the majority of its cartridges at issue. These "restricted" cartridges have been commonly referred to as "Prebate cartridges" for the reasons that follow: Lexmark runs what it called at one time its "Prebate Program" and what now is referred to as the "Lexmark Return Program." [R. 594 at 3, n. 4]. In that program, Lexmark's customers buy printer cartridges at an upfront discount in exchange for the customer agreeing to use the cartridge only once and then return the empty cartridge only to Lexmark. According to Lexmark, Lexmark offers " '[r]egular' toner cartridge[s] for those customers who do not choose the Prebate/Cartridge Return Program toner cartridge[s] with [their] terms." [R. 2 at 8]. Therefore, "Prebate" is temporally the reverse of a rebate.

Over the years, the precise language of Lexmark's Prebate terms printed across the top of Prebate cartridge boxes has varied. [*See, e.g.,* R. 573 at 3]. However, currently the terms read:

> RETURN EMPTY CARTRIDGE TO LEXMARK FOR REMANUFACTURING AND RECYCLING
>
> Please read before opening. Opening this package or using the patented cartridge inside confirms your acceptance of the following license agreement. This patented Return Program cartridge is sold at a special price subject to a restriction that it may be used only once. Following this initial use, you agree to return the empty cartridge only to Lexmark for remanufacturing and recycling. If you don't accept these terms, return

the unopened package to your point of purchase. A regular price cartridge without these terms is available.[4]

[R. 594, 3–4 (Lexmark has provided the Court with a demonstrative cartridge and cartridge box with the above Prebate language, as Lexmark represented that it would at Record 519 at 9, n. 13) ]. Including English, these terms are printed in six different languages. *Id.*

## II. STANDARD OF REVIEW

While the legal standards for evaluating the parties' discrete contentions are set forth below as they arise, generally Fed. R.Civ.P. 56(c) provides that judgment for the moving party is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *See also Browning v. Dep't of Army,* 436 F.3d 692, 695 (6th Cir.2006). While all inferences are drawn in favor of the non-moving party, that party still must present some affirmative evidence supporting its position to defeat an otherwise appropriate motion for summary judgment. *See id.; see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (non-movant must "do more than simply show there is some metaphysical doubt as to the material facts") (citations omitted); *Celotex Corp. v. Catrett,* 477 U.S. 317, 324–25, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Stated alternatively, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v.*

4. SCC's motion at Record No. 511 is based on a prior version of these Prebate terms. [R. 511 at 2]. For the purpose of SCC's motion, considered below, and the analysis of such, the Court finds no material difference between the two sets of terms.

*Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The foregoing standards for summary judgment review apply to patent cases as well. *See, e.g., Avia Group Int'l, Inc. v. L.A. Gear Cal., Inc.*, 853 F.2d 1557, 1560–61 (Fed.Cir.1988).

## III. PATENT VALIDITY

### A. Validity of Lexmark's Nine Patents at Issue

■ Lexmark in its current Motion first seeks a judgment that nine of its sixteen patents in suit are valid as a matter of law. All of these nine patents appear to be utility patents, as opposed to design or chemical patents. [*See, e.g.,* R. 488, Attach. 1 and Attach. 2 at p. 3]. The validity of Lexmark's design patents are the subject of SCC's Motion for Summary Judgment at Record No. 488, and not considered or referenced in Lexmark's Motion; however, the Court will take up this issue in the following section of this Order. Regarding the nine patents at issue in Lexmark's current Motion, the United States Code could not be clearer: "A patent shall be presumed valid." 35 U.S.C. § 282. This presumption is rebuttable, but "[t]he burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity." *Id.* The challenger's burden is one of clear and convincing evidence. *North Am. Vaccine v. Am. Cyanamid Co.*, 7 F.3d 1571, 1579 (Fed.Cir.1993). Far from raising traditional challenges to validity of patents or claims therein, such as indefiniteness under 35 U.S.C. § 112, SCC and the Counterclaim Defendant remanufacturers are largely silent on the issue of patent (in)validity with regards to these nine patents.[5] Rather, SCC in its Response focuses on the validity of Lexmark's Prebate program as a means of enforcing patent rights, and the remanufacturers largely address Lexmark's overseas theory of infringement, affirmative defenses like misuse, and infringement issues not dependant on invalidity. While SCC and the remanufacturers have asserted various affirmative defenses in this action, such as first sale/patent exhaustion and patent misuse, these defenses do not invalidate patents if successful.[6] *See, e.g., U.S. Gypsum Co. v. Nat'l Gypsum Co.*, 352 U.S. 457, 77 S.Ct. 490, 494–95, 1 L.Ed.2d 465 (1957) (patent infringement is actionable subsequent to misuse, once the misuse has been "purged"). The Counterclaim Defendants offer not even a scintilla of evidence or reason that might suggest Lexmark's nine patent at issue in this Motion are invalid, and accordingly Lexmark is entitled to judgement on this point. [*Cf.* R. 488 (in which SCC does make invalidity arguments with regard to Lexmark's design patents not at issue in Lexmark's current Motion)]. However, Lexmark only alleges that 93 claims of the nine patents read in various combinations on its accused cartridges. [R. 519 at 33]. It is only on these 93 claims that the Court makes a ruling of validity; any additional claims of the nine patents are simply not before the Court.

The Court now turns to the issue of the validity of two of Lexmark's design patents. These two design patents are not

---

**5.** Because the remanufacturers do not even make conclusory contentions regarding the validity of Lexmark's patents, claim construction is not necessary to determine whether the patent claims are, for example, too indefinite.

**6.** The Court acknowledges that "patent invalidity" is in and of itself an affirmative defense;

however, the remanufacturers offer nothing to support an application of patent invalidity analysis under whatever un-argued theory to the current facts. *MedImmune, Inc. v. Genentech, Inc.*, —— U.S. ——, ——, 127 S.Ct. 764, 780, 166 L.Ed.2d 604 (U.S.2007).

addressed by Lexmark in its Motion for Summary Judgment of Direct Infringement of Nine Patents Against the Remanufacturers [R. 519]; rather, this issue is raised by SCC at Record No. 488:

### B. Lexmark's Design Patents [Static Control Component's ("SCC") Motion for Summary Judgment for Non–Patentability and Invalidity of Lexmark's Design Patents at Record No. 488]

SCC's challenge to the validity of Lexmark's design patent at Record No. 488 specifically stems from the part of Lexmark's Counterclaim to SCC's February 24, 2004 Complaint, in which Lexmark alleges, *inter alia*, that SCC "has infringed and continues to infringe the Lexmark patents-in-suit by actively inducing others to infringe with specific intent and by contributing to the infringement by others ...." [R. 67 at ¶ 89]. Lexmark makes similar allegations against Counterclaim Defendants MSE and Pendl. *Id.* at ¶ 99. Accordingly, Pendl and MSE join the Design Patent Motion. [R. 489, 491]. In its Design Patent Motion, SCC alleges that two of Lexmark's U.S. design patents (D399,249 and D458,300) that cover various Lexmark printer cartridges are invalid, and accordingly, SCC can not be liable for actively inducing the infringement of those two patents. While these two design patents are not specifically mentioned in Lexmark's Counterclaim, they are clearly two of Lexmark's "patents-in-suit" as referenced in the Counterclaim. *See id.* By letter dated June 22, 2006, Lexmark disclosed and/or affirmed to SCC that Design Patents D399,249 and D458,300 are included in its allegations of infringement. [R. 488, Attach. 2]. Design Patent D399,249 allegedly reads on Lexmark's T52X, T62X, and T63X printer cartridges; Design Patent D458,300 allegedly reads on Lexmark's E320/22, E321/23, and E220 printer cartridges. *Id.*

### 1. SCC's Burden of Establishing Patent Invalidity with Regard to the Design Patents

With regard to design patents specifically, "[A] challenger [to a design patent] must establish facts, by clear and convincing evidence, which persuasively lead to the conclusion of invalidity." *Avia Group Int'l, Inc. v. L.A. Gear Cal., Inc.*, 853 F.2d 1557, 1562 (Fed.Cir.1988). The patent owner is entitled to a presumption of validity; however, "the presumption is one of law, not fact, and does not constitute 'evidence' to be weighed against a challenger's evidence." *Id.* Patent validity, when put at issue by a challenger, is a question of law for the Court to decide. *Id.*

### 2. Analysis

Pursuant to 35 U.S.C. § 171, "Whoever invents any new, original and ornamental design for an article of manufacture may obtain a patent therefor, subject to the conditions and requirements of [Title 35]." Because a key requirement of a design patent is ornamentation, "[a]rticles which are concealed or obscure[d] are not proper subjects for design patents, since their appearance cannot be a mater of concern." *In re Stevens*, 36 C.C.P.A. 1017, 173 F.2d 1015, 1016 (C.C.P.A.1949) (as quoted in *In re Webb*, 916 F.2d 1553, 1557 (Fed.Cir.1990)). Citing cases such as *Stevens*, the Federal Circuit has set forth the parameters of § 171's ornamentation requirement in *In re Webb*:

We read those cases to establish a reasonable general rule that presumes the absence of ornamentality when an article may not be observed. This is a sound rule of thumb, but it is not dispositive.... In each case, the inquiry must extend to whether at some point in the life of the article an occasion (or occa-

sions) arises when the appearance of the article becomes a "matter of concern." 916 F.2d 1553, 1557 (citing *Larson v. Classic Corp.,* 683 F.Supp. 1202, 1202–03 (N.D.Ill.1988), in which "the appearance of a waterbed mattress [might be] a matter of concern to the purchasing public," even if the mattress is not meant to be seen during normal use). In *Webb,* the court was called upon to decide whether the inventor of a prosthetic hip implant could have a valid design patent on the implant. Although the implant was not meant to be seen during its final use—that is, after implantation into the body—Webb was able to prove that the appearance of the implant was a matter of concern for marketing purposes, such as when the implant was pictured in advertisements and displayed at trade shows. Accordingly, in order to maintain a valid design patent, the ornamentation of an article must be a matter of concern during the "normal and intended use" of the article, defined as the "period in the article's life, beginning after completion of manufacture or assembly and ending with the ultimate destruction, loss, or disappearance of the article." *Id.* at 1557–58.

In *Seiko Epson Corp. v. Nu–Kote International, Inc.,* the Federal Circuit reviewed a decision by a district court which found a design patent on a printer cartridge invalid because the design was " 'not a matter of concern to consumers.' " 190 F.3d 1360, 1368 (Fed.Cir.1999). The district court based its decision on the fact that the cartridge is not "in view after its installation and during use in the printer." *Id.* The Federal Circuit reversed the district court, because the premise of the district court's decision was incorrect: "[s]ince the only ground on which the district court relied was the incorrect ground that the design must be of continuing 'concern' during use of the article, . . . the judgment of invalidity of the [design patent] is reversed." *Id.* at 1368–69.

■ This Court does not rely on the same mistaken premise on which the district court in *Seiko* based its opinion. Rather, the Court finds that the appearance of Lexmark's printer cartridges in question are of no matter of concern during those cartridges' entire existence—beginning after completion of manufacture or assembly and ending with the ultimate destruction, loss, or disappearance of those cartridges. This is the test for the appropriateness of a design patent as set forth in *In re Webb,* 916 F.2d at 1557–58 (affirmatively cited in *Seiko,* 190 F.3d at 1368).

Lexmark argues, "[a]ll that is necessary [under *Webb* for a valid design patent] is that the article be visible at some point during its 'normal and intended use.' " [R. 506 at 4, citing *Webb,* 916 F.2d at 1557–58]. This characterization of *Webb* is flatly wrong, because how often a person sees a design makes no difference, in and of itself, regarding the patentability of that design; the test, as stated above, is whether the article's appearance is a "matter of concern" at any time during the broadly-defined "normal and intended use" of the article. *Webb* at 1557–58. In driving home the point that a person merely seeing an article is inadequate for a design patent if the article's appearance is of no matter of concern, the *Webb* court distinguished its opinion from the court's still-valid opinion in *In re Stevens,* in which a vacuum rotary brush generally concealed during use was not a proper subject for a design patent:

> It is possible, as in *Stevens,* that although an article may be sold as a replacement item, its appearance might not be of any concern to the purchaser during the process of sale. Indeed, many replacement items, including vacuum cleaner brushes, are sold by replacement or order number, or they are noticed during sale only to assess functionality. In such circumstances, the

PTO may properly conclude that an application provides no evidence that there is a period in the commercial life of a particular design when its ornamentality may be a matter of concern.

*Id.* at 1558 (referencing *In re Stevens,* 36 C.C.P.A. 1017, 173 F.2d 1015 (C.C.P.A. 1949)).

Because Lexmark misconstrues the standard under *Webb,* it makes much ado about periods of time when consumers can see its cartridges. [*See, e.g.,* R. 506 at 8–9 (stating, *inter alia,* "[p]rinters sometimes experience 'paper jams.' In many cases, the cartridge must be removed from the printer to clear a paper jam, and is visible in its entirety.")] This does nothing to suggest that the cartridges are a matter of concern to the consumers at any point in time from post-manufacture to ultimate destruction, depletion, or loss. When Lexmark does attempt to address the "matter of concern" requirement, the best Lexmark can do is say that it pictures cartridges on its boxes, not to market cartridges, but to assist the consumer in identifying the cartridge required for use in that consumer's printer.[7] [R. 506 at 10]. And Lexmark notes that pictures of its cartridges are shown online to "provide the purchaser with a visual confirmation that the cartridge in the box corresponds to the cartridge *needed to replace* an existing cartridge." *Id.* (emphasis added). Lexmark's own averments emphasize that the consumer is locked into buying a certain replacement cartridge in order for his printer to operate. Accordingly, though Lexmark persuasively maintains that locating the correct cartridge is a matter of concern to consumers, SCC is more or less correct in its assertion that Lexmark fails to contest in its Response that the *design* of its cartridges is a matter of concern to customers.

█ A similar, though distinct, requirement to a patentable design being a matter of concern at some point is that a patentable design cannot be dictated by functionality. In *Best Lock Corp. v. Ilco Unican Corp.,* a key manufacturer attempted to maintain a design patent on a key "that provid[ed] a wider key profile than standard keys and includ[ed] other features to deter lock picking." 94 F.3d 1563, 1564 (Fed.Cir.1996). In determining that the key was not a proper subject of design patent, the court relied on authority that "when a configuration is the result of functional considerations only, the resulting design is not patentable as an ornamental design for the simple reason that it is not 'ornamental' ...." *Id.* at 1566 (quoting, parenthetically, *In re Carletti,* 51 C.C.P.A. 1094, 328 F.2d 1020, 1022 (C.C.P.A.1964)). In support of its design patent, the manufacturer argued that "although a particular key and its corresponding lock must mate to operate the lock, an unlimited number of key blade and corresponding keyway designs are available. Choice of any particular design is arbitrary." *Id.* Nevertheless, the court found that the key design patent was invalid: the key design was "dictated solely by functional concerns," namely the necessity that the key interact correctly with the lock.

Clearly, different interfaces between key blades and corresponding lock keyways can be designed to permit the combination to function as a lock and key set.

---

7. Lexmark states,
 Lexmark does provide pictures or other depictions of the cartridges on its own cartridge boxes. This is because the appearance of the cartridge is a matter of concern to the customer. Lexmark provides the picture or other depiction on its cartridge boxes so that the customer will have a visual confirmation that the cartridge in the box corresponds to the cartridge that has been installed in the printer.
 [R. 506, Exhibit 3, ¶ 20 (citations omitted)].

However, Best Lock's patent does not claim the combination of a lock and corresponding key. Instead, the claim in the [relevant] design patent is limited to a key blade, which must be designed as shown in the [relevant] patent in order to perform its intended function.

*Id.* Similarly, Lexmark's printers dictate the design of the printer cartridges.

The Federal Circuit also considered the issue of functionality over ornamentality in *Avia Group International, Inc. v. L.A. Gear California, Inc.*, 853 F.2d 1557 (Fed. Cir.1988). There, the design patents in question involved the outer sole and "upper" of an athletic shoe. The Court cited settled precedent that "if a patented design is 'primarily functional,' rather than primarily ornamental, the patent is invalid." *Id.* at 1563 (citations omitted). However, the Court affirmed the validity of the design patents at issue, because "the designs in suit have not persuasively been shown to be functional." *Id.* This is distinguishable from the current case, in which it is evident that the design of the printer cartridges is dictated by the printers they fit. The only "ornamental" feature Lexmark appears to cite is the number of notches on extra high yield versus regular and high yield cartridges. However, the purpose of the notches are to indicate to the customer whether or not he or she is using the correct printer cartridge (or prevent the use of the incorrect cartridge). Accordingly, the "notch design" is functional, because the consumer can only use the "correctly notched" cartridge in his printer. The notches do not present an ornamental choice in cartridges for the consumer.

As Lexmark points out, "a challenger [to a design patent] must establish facts, by clear and convincing evidence, which per-

suasively lead to the conclusion of invalidity." *Avia Group Int'l, Inc. v. L.A. Gear Cal., Inc.*, 853 F.2d at 1562 (citations omitted); [R. 506 at 2–3]. The Court is of the opinion that SCC has discharged its burden of persuasion by clear and convincing evidence "that the established facts lead to a conclusion of invalidity." *Id.* SCC does indeed set forth undisputed facts about Lexmark's cartridges that lead to a conclusion that the design of the cartridge is of no concern. For instance, customers can purchase replacement cartridges for printers online by model number; printers are generally shipped with the correct toner cartridge already installed. [R. 506, Exhibit 3, ¶ 15, 21]. Additionally, for example, cartridges are hidden from view inside the printer while in use.[8] To the extent that Lexmark refutes SCC's various statements of fact, accepting Lexmark's version of the facts as true, Lexmark still fails to set forth any evidence suggesting that its cartridge design is ever a matter of concern. The cartridges simply being in the eyesight of consumers at various points of time simply has no bearing on whether the cartridges are a matter of concern to consumers or others:

> Almost every article is visible when it is made and while it is being applied to the position in which it is to be used. Those special circumstances, however, do not justify the granting of a design patent on an article such as that here under consideration which is always concealed in its normal and intended use.

*In re Stevens*, 36 C.C.P.A. 1017, 173 F.2d 1015 (C.C.P.A.1949). The instances that Lexmark points out of when a consumer sees the cartridge are all "special circumstances." For instance, SCC is correct to state that although a consumer can see the

---

8. Though this is not dispositive under *Seiko Epson Corp.*, it remains evidence under *Stevens,* as refined by *Webb,* that Lexmark's car-

tridges are not the proper subject of design patent.

cartridge while fixing a paper jam, Lexmark cannot possibly *intend* that its printers jam. [R. 577].

### 3. Summary of Findings Regarding Lexmark's Two Design Patents

For the reasons explained above, the Court finds that the appearance of the printer cartridges at issue in this litigation and covered by Design Patents D399,249 and D458,300 are of no "matter of concern" to consumers or others throughout the printer cartridges' "normal and intended use," as defined by the Federal Circuit in *In re Webb, supra.* Furthermore, the Court finds that said printer cartridges' *design*—rather than merely the cartridges themselves—is "primary functional" pursuant to *Avia Group International,* 853 F.2d at 1563. Accordingly, U.S. Patent Nos. D399,249 and D458,300 are invalid, and the Court will grant SCC's Motion for Summary Judgment for Non–Patentability and Invalidity of Lexmark's Design Patents. [R. 488].

## IV. LEXMARK'S FIRST THEORY OF PATENT INFRINGEMENT: PREBATE

### A. Preamble: The Act of Remanufacturing Cartridges Originally Sold in the United States, Absent Prebate, is Permissible Repair

 Due to the concept of "patent exhaustion," when no Prebate terms read on Lexmark's cartridges originally sold in the United States, the Counterclaim Defendants (or anyone else) have the right to collect those cartridges when the toner has run out and remanufacture and resale them. This conduct, known as "permissible repair," is exactly the business in which MSE and Pendl participate.[9] The Court of Appeals for the Federal Circuit has described the concept of "patent exhaustion" (or the "first sale" doctrine) as follows: "The unrestricted sale of a patented article, by or with the authority of the patentee, 'exhausts' the patentee's right to control further sale and use of that article by enforcing the patent under which it was first sold." *Jazz Photo Corp. v. Int'l Trade Comm.,* 264 F.3d 1094, 1105 (Fed.Cir.2001). "The theory behind this rule is that in such a transaction, the patentee has bargained for, and received, an amount equal to the full value of the goods." *B. Braun Med. v. Abbott Lab.,* 124 F.3d 1419, 1426 (Fed.Cir.1997) (citation omitted). Pursuant to this doctrine, Lexmark's original, domestic, unrestricted sale of a cartridge "exhausts" Lexmark's right to control further use of the cartridge by enforcing its patents which read on the cartridge when first sold. As such, Lexmark does not even contest or deny that third party remanufacturers may collect, repair, and resell used Lexmark toner cartridges that were originally sold unconditionally in the United States.

 In some instances, the act of "repairing" an article after the patent rights that read on that article have been exhausted can go beyond "permissible repair" and be classified as "reconstruction." The reconstruction of an article without license from the patentee is generally prohibited and, affirmative defenses aside, constitutes patent infringement. The Federal Circuit considered the difference between repair and reconstruction in its seminal case, *Jazz Photo Corp. v. Int'l Trade Comm'n.* 264 F.3d 1094 (Fed.Cir.2001).

---

9. The Counterclaim Defendants would argue that Prebate is irrelevant to their right to "permissibly repair" Lexmark cartridges, or remanufacture used Lexmark cartridges without infringing on any of Lexmark's patents.

This section, however, is meant to illustrate the nature of the Counterclaim Defendant remanufacturer's business under patent law, prior to the insertion of the issue of Prebate, which is discussed later.

The distinction between permissible repair and reconstruction arises because, "[w]hile the ownership of a patented article does not include the right to make a substantially new article, it does include the right to preserve the useful life of the original article." *Id.* at 1102. This area of law is driven by case-by-case precedent and application of that precedent by analogy to a particular set of facts. *Id.* at 1103. In conducting this exercise, the Federal Circuit found the process, with regards to disposable cameras first sold in the United States, of "inserting new film and [a] film container, resetting the film counter, and resealing the broken case" to be permissible repair. *Id.* at 1106.[10]

It is this distinction between permissible repair and reconstruction that is at the heart of both Pendl and MSE's Motions for Summary Judgment of Permissible Repair at Record Nos. 523 (Pendl) and 565(MSE) (collectively, the "Permissible Repair Motions"). Both parties move for summary judgement that their manufacturing processes constitute permissible repair. Lexmark does not argue in response to the Permissible Repair Motions that the process of remanufacturing Lexmark's cartridges, as done by the Counterclaim Defendant remanufacturers, is prohibited reconstruction. [R. 617]. Rather, Lexmark argues permissible repair is an affirmative defense to infringement that only arises if the patent rights in the article sold have been exhausted when remanufactured and resold. Lexmark further argues that (1) its single-use restriction (Prebate) terms prevent patent exhaustion on most of its cartridges, because Prebate reserves to Lexmark patent rights that would otherwise be exhausted by an unrestricted sale in the United States and (2) patent exhaustion does not apply at all to cartridges

originally sold outside the Untied States. *See Mallinckrodt, Inc. v. Medipart, Inc.,* 976 F.2d 700 (Fed.Cir.1992); *Jazz Photo Corp.,* 264 F.3d 1094. To the extent that Lexmark manufacturers some cartridge sold without restriction in the United States, Lexmark argues that it is the remanufacturers' "burden to show that Lexmark exhausted its patent rights covering the used Lexmark cartridges that the [r]emanufacturers remanufacture, offer for sale, and sell." [R. 617 at 5 (citing *Jazz Photo Corp.,* 264 F.3d at 1102) ].

The Court believes that Lexmark has missed the point of the Permissible Repair Motions. The Counterclaim Defendant remanufacturers undoubtedly challenge the validity of Lexmark's means of restricting the use of its cartridges, namely Prebate, and the notion that sales outside the United States are never subject to patent exhaustion. [*See* R. 648]. However, for the purposes of the Permissible Repair Motions, the Court believes that Pendl and MSE merely seek the assurance that their remanufacturing process is not, as a matter of law, reconstruction. [R. 673]. Lexmark does not contend that the remanufacturers' processes constitute reconstruction of Lexmark cartridges, but even were Lexmark to argue such, the Court finds that the current remanufacturers' processes are analogously indistinguishable from the remanufacturing process at issue in *Jazz Photo Corp.* Similar to *Jazz Photo Corp.,* the remanufacturers collect used Lexmark cartridges, replace any worn component parts and refill the cartridges with toner. Accordingly, the Court will grant Pendl and MSE's Permissible Repair Motions to the degree that Lexmark cannot successfully argue in support of its infringement claims that the remanufacturers engage in reconstruction of

---

**10.** The remanufacture of the cameras in *Jazz Photo Corp.* also commonly included such acts as "replacing the battery in flash [cam-

eras]" and "replacing the winding wheel or modifying the film cartridge to be inserted." *Jazz Photo. Corp.,* 264 F.3d at 1101.

used Lexmark cartridges. To wit, the re-manufacturers engage in repair, rather than reconstruction, although the "permissibility" of that repair, *vel non*, depends at least in part on Lexmark's theories of patent infringement discussed below.

## B. The Motions and Posture of Issues Regarding Prebate

The Court will ultimately address Lexmark's request for judgment on the validity of Prebate as a mechanism of exercising patent rights by addressing the challenges to Prebate's validity. Accordingly, the Court first addresses a topically similar motion by SCC. In its Motion for Partial Summary Judgment that There are No Prebate/Return "Contracts" Because Lexmark Cannot Show any Meeting of the Minds, SCC specifically argues that Lexmark cannot establish that requisite contracts exist to maintain its state law claims for tortious interference with contractual relations. [R. 511]. Counterclaim Defendants Pendl and MSE (as well as NER Data Products, Inc.) generically join SCC's motion. [R. 526, 536, 551, 584].[11]

In SCC's motion, it argues that, regarding Prebate, "Lexmark cannot show any meeting of the minds as required by Kentucky contract law [or the UCC]" and therefore, Lexmark's Prebate terms cannot constitute valid, enforceable contracts between Lexmark and its customers. [R. 511 at 1]. Because the existence of valid contract(s) is essential to recovery under Lexmark's state law claims, the implication of SCC's requested relief, if granted, would be that Lexmark cannot maintain its claims for intentional interference with

contractual relations, intentional interference with prospective economic advantage, and civil conspiracy predicated on said tortious interference claims. [R. 67 at ¶ 105–124]. While SCC's Motion specifically deals with Lexmark's state law tortious interference claims, the validity of Prebate terms under state law is also essential for Lexmark's recovery for patent infringement; while the Court of Appeals for the Federal Circuit has noted the legality of restrictive licenses as a means of exercising patent rights (issues like antitrust aside), Prebate as an enforceable term of sale is directed by state contract law. *Mallinckrodt, Inc. v. Medipart, Inc.*, 976 F.2d 700, 707 n. 6 (Fed.Cir.1992).

## C. Analysis

The Court will first address SCC's meeting-of-the-minds arguments, because those arguments focus on the nature of the Prebate agreements from the prospective of state contract law. SCC also raises as a defense to Prebate what is referred to as the "first sale" doctrine. The Court will address separately this argument in opposition to the validity of Prebate, because the first sale doctrine is a concept of patent law, specifically the law of patent exhaustion, rather than contract law exclusively.[12] Finally, the Court will turn to additional arguments that SCC makes against the validity of Prebate before concluding that Prebate program is valid as a matter of law.

### 1. Meeting of the Minds Argument

SCC argues that the Prebate terms printed on cartridge packaging are not

---

11. As a cursory matter, SCC's Reply to Lexmark's Response is tendered at R. 642 with SCC's Motion for Leave to File Excess Pages. SCC seeks to file a 17 page Reply, two pages over the limit stated in Local Rule 7.1(d). The Court will grant SCC's motion to file, and the Court has considered the content of said tendered Reply in preparation of this Order.

12. SCC argues the first sale doctrine both in its Reply to its Motion at R. 511 and as a Response to Lexmark's motion at R. 519 seeking summary judgment, *inter alia*, that "Lexmark's Prebate license is a valid, single-use, patent license." [R. 642 (Reply), 626 (Response)].

valid contracts, because Lexmark and its customers never have a "meeting of the minds" over the terms of the alleged contract. SCC points out that top executives at Lexmark were unsure in depositions as to the meaning of "you agree to return the empty cartridge only to Lexmark" or other terms and conditions of alleged prebate contracts. [R. 511 at 4]. SCC additionally argues, *e.g.*, that at least one executive could not definitively estimate at what point the alleged contract is formed—upon purchase of the cartridge; upon opening the cartridge box; or upon using the cartridge itself. *Id.* at 6. SCC's arguments are without merit.

Lexmark's Prebate agreements are akin to contracts of adhesion, so named because the contracts "are offered to the … consumer on essentially a 'take it or leave it' basis without affording the consumer a realistic opportunity to bargain." *Jones v. Bituminous Cas. Co.*, 821 S.W.2d 798, 801 (Ky.1991). The nature of the "Prebate agreement" ought not to be thought of as a stand alone contract. Rather, Prebate terms are integrally connected to the broader sale of a printer cartridge. Without the underlying sale, there is no reason to enter a Prebate agreement. The particular Prebate agreement is akin to a "shrinkwrap license," in which a vendor's written license becomes "effective as soon as the customer tears the wrapping from the package." *ProCD, Inc. v. Zeidenberg*, 86 F.3d 1447, 1449 (7th Cir.1996) (whereas the outside of the packaging in *ProCD* referenced a license agreement enclosed inside the product box, the entire terms of Lexmark's Prebate agreement are printed on the box and visible before the box is opened). These types of licensing agreements have been held to be valid and enforceable, and the Ninth Circuit has found this to be true regarding Lexmark's very Prebate agreement *sub judice*. *Id.;*

*Ariz. Cartridge Remanufacturers Ass'n v. Lexmark Int'l, Inc.*, 421 F.3d 981 (9th Cir.2005).

■ In Response to SCC's argument that Lexmark's agents/executives themselves are uncertain as to the terms and conditions of the Prebate agreement, Lexmark chides SCC for selective use of deposition testimony. However, the opinions of Lexmark's agents are frankly irrelevant under the current circumstances. Lexmark correctly notes that "contract law looks to the parties' 'objective manifestation of assent' found in their words and actions, not subjective indications of their state of mind, to determine whether a contract was intended." [R. 594 at 30 (citing *Ford Motor Co. v. Kahne*, 379 F.Supp.2d 857 (E.D.Mich.2005))]. Accordingly, confusion on the part of Lexmark executives as to various elements of the Prebate terms does not vitiate the explicit language on the cartridge box that "[o]pening this package or using the patented cartridge inside confirms your acceptance of the following license agreement." The essential terms of the contract are also clearly set forth on the packaging: "This patented Return Program cartridge is sold at a special price subject to a restriction that it may be used only once. Following this initial use, you agree to return the empty cartridge only to Lexmark for remanufacturing and recycling."

■ To the extent that there may be confusion over the meaning of "return the empty cartridge only to Lexmark for remanufacturing and recycling," that does not indicate that there is no meeting of the minds. [R. 511 at 3, ¶ 9 & 10, ¶ 16]. Rather, the solution for problems of ambiguity in contracts of adhesion is not finding a lack of contract all together, but rather construing the term against the drafter. "Uniformly, contracts of adhesion … are construed against the party who

formulated the terms and any doubt resolved in favor of the other party." *Ky. Lottery Corp. v. Casey,* 862 S.W.2d 888, 889 (Ky.1993) (citation omitted). On the one hand, the language, "return the empty cartridge only to Lexmark," could be a positive requirement to return the cartridge to Lexmark when finished. Alternatively, the language could be construed to mean that if the user returns the cartridge to anyone, the cartridge must be returned to Lexmark; however, the user has the option of also throwing the cartridge away or retaining it for whatever reason. Since contracts of adhesion are construed against the drafter, the latter interpretation would control, but the plain meaning of the provision makes clear that the user is not to return used cartridges to anyone other than Lexmark.

■ SCC also argues that Janet Smith, "the Lexmark executive who trains the Lexmark sales team," "does not know how a Prebate/Return 'contract' is formed—*i.e.,* whether it is upon the customer's purchase of the cartridge, or later when the customer opens the cartridge box, or even later when the customer uses the cartridge." [R. 511 at 5–6]. Assuming this statement is a proper characterization of Ms. Smith's true knowledge or belief, this too is irrelevant. "An agreement sufficient to constitute a contract for sale may be found even though the moment of its making is undetermined." KY. REV. STAT. ANN. § 355.2–204(2) (2006); *see also Ariz. Cartridge Remanufacturers Ass'n v. Lexmark Int'l, Inc.,* 421 F.3d 981, 987 (9th Cir.2005).

It is not unfair for the court to speculate from where SCC's "meeting of the minds" argument originated. In *Jazz Photo Corp. v. International Trade Commission,* a camera manufacturer argued that "the instructions and warnings printed on the covers of the LFFPs [lens-fitted film packages a/k/a 'single use' cameras] ... constituted a license limited to a single use." 264 F.3d at 1107. The nature of the alleged single-use license was described by the Administrative Law Judge ("ALJ") as follows:

A Fuji flash QuickSnap single use camera is in a box and each of the box and the outer cardboard cover of the camera has statements instructing the purchaser to not remove the film and return the camera to the photoprocessor and further cautioning the purchaser about the risk of electrical shock if opened by the purchaser.... [The packaging also] instructs the purchaser that the single use camera will not be returned to the purchaser after processing. Similar notations are on [other cameras].

*Id.* (quoting the ALJ's opinion). The Federal Circuit found that "[t]hese statements are instructions and warnings of risk, not mutual promises or a condition placed upon the sale;" accordingly, the language on the camera packaging was "not in the form of a contractual agreement by the purchaser to limit reuse of the cameras. There was no showing of a 'meeting of the minds' whereby the purchaser ... may be deemed to have breached a contract or violated a license limited to a single use of the camera." *Id.* at 1108.

■ Unlike in *Jazz Photo,* the Court finds that Lexmark's Prebate terms clearly set forth contractual terms. The agreement warns that opening the package "confirms [the user's] acceptance of the following license agreement." The terms thereof are that, in consideration of a "special price," the user is "subject to a restriction that [the cartridge] may be used only once" and that "[f]ollowing this initial use, [the user] agree[s] to return the empty cartridge only to Lexmark for remanufacturing and recycling." This is exactly the sort of adhesion licensing agreement that has been held to be valid.[13] *See, e.g., Hill*

---

13. This case, at its preliminary injunction phase, has already been considered by the

*v. Gateway 2000,* 105 F.3d 1147 (7th Cir. 1997); *ProCD, Inc. v. Zeidenberg,* 86 F.3d 1447 (7th Cir.1996).

### 2. The First Sale Doctrine

■ SCC additionally argues, chiefly as a defense to Lexmark's motion for summary judgment on the validity of its Prebate program [R. 626], that the so-called "first sale" doctrine prevents Lexmark from binding most final users of Lexmark cartridges with Prebate conditions, because the vast majority of Lexmark's cartridges are sold first to reselling middlemen, rather than directly from Lexmark to the end user.

Again, the "first sale" doctrine, also commonly referred to as "patent exhaustion," is explained as follows: "The unrestricted sale of a patented article, by or with the authority of the patentee, 'exhausts' the patentee's right to control further sale and use of that article by enforcing the patent under which it was first sold." *Jazz Photo Corp. v. Int'l Trade Comm.,* 264 F.3d 1094, 1105 (Fed.Cir. 2001). SCC argues that, assuming *arguendo* that Lexmark's theories of recovery are correct, in order for Lexmark to recover from the Counterclaim Defendants for direct and/or contributory patent infringement, Lexmark's Prebate agreement must bind the end user. However, to the extent the Prebate agreement purportedly binds the end user, rather than middlemen, the sale of cartridges to middlemen is an unrestricted sale that exhausts Lexmark's patent rights. Accordingly, under the first sale doctrine, the unrestricted sale of cartridges to middlemen exhausts Lexmark's right to control the further use of cartridges by end users. SCC's argument gives short shrift to the realities of market distribution by misapplying the scope of patent exhaustion.

■ "[E]xhaustion of the patent right depends on 'whether or not there has been such a disposition of the article that it may fairly be said that the patentee has received his reward for the use of the article.' " *Id.* at 1105 (citing *Intel Corp. v. ULSI Sys. Tech., Inc.,* 995 F.2d 1566, 1568 (Fed.Cir.1993)). SCC does not contest in its Motion that Lexmark commands less of a price for its cartridges when the cartridges are marked Prebate. If Prebate licenses did not pass through the middlemen for ultimate acceptance by the end user, then Lexmark would be giving consideration—a lower price for a cartridge than the cartridge would otherwise command—for nothing in return.[14] According-

---

Court of Appeals for the Sixth Circuit. *Lexmark Int'l, Inc. v. Static Control Components, Inc.,* 387 F.3d 522 (6th Cir.2004). In his opinion, concurring in part and dissenting in part, Judge Feikens prophetically describes the merits, *vel non,* of SCC's current "meeting of the minds" argument:

SCC contends that such shrinkwrap agreements are not enforceable. In support of this, at least one amicus brief cites a 2001 Federal Circuit court decision that held there must be a "meeting of the minds" in order for restrictions in the agreement to be enforceable. Other circuits have upheld the validity of shrinkwrap agreements. Here, the shrinkwrap agreement was clear and the district court could find that it supports the conclusion that there was a meeting of the minds and the agreement is enforce-

able. To wit: "This all-new cartridge is sold at a special price subject to a restriction that it may be used only once. Following this initial use, you agree to return the empty cartridge only to Lexmark for re-manufacturing and recycling. If you don't accept these terms, return the unopened package to your point of purchase. A regular price cartridge without these terms is available." Finally, I note this case is factually different from *Hewlett–Packard Co. v. Repeat–O–Type Stencil Mfg. Corp. Inc.,* 123 F.3d 1445 (Fed.Cir.1997), in which the shrinkwrap agreement contained only a warning against refilling, and did not condition the sale on a promise not to refill. *Id.* at 563, n. 10.

14. SCC argues that the "special" price for Prebate cartridges is actually a "normal"

ly, pursuant to the law of patent exhaustion, Lexmark does not fully "receive[ ][its] reward for the use of the article" until the Prebate license is effectuated. *See B. Braun Med. v. Abbott Lab.*, 124 F.3d 1419, 1426 (Fed.Cir.1997) ("The theory behind this [patent exhaustion] rule is that in such a transaction, the patentee has bargained for, and received, an amount equal to the full value of the goods.") (citations omitted). To hold otherwise would create an arbitrary distinction that direct sellers to consumers can maintain restrictive licenses on their patented products while those who happen to get their products to the consumer via middlemen cannot. Additionally, if "middlemen" include all retailers, then SCC's position would seem to run afoul of the Federal Circuit's observation that the legality of restrictive licenses "seems clear." *Mallinckrodt, Inc. v. Medipart, Inc.*, 976 F.2d 700, 704 (Fed.Cir. 1992). Given market realities of distribution, "clearly legal" restrictive licenses would become the rare exception under SCC's theory. *Accord id.* at 705 (rejecting the position that "the enforceability of a restriction to a particular use is determined by whether the purchaser acquired the device from a manufacturing licensee or from a manufacturing patentee.").

### 3. Additional State Law Challenges by SCC to Prebate

■ SCC's argument that Lexmark gives no consideration for Prebate is also incorrect. It is undisputed that Lexmark charges less for Prebate cartridges than Regular cartridges. Therefore, the difference in price represents the consideration for Prebate. To the extent that SCC argues that Lexmark sells its Prebate cartridges at a "normal" price, rather than a "special" or "reduced" price, and that it

sells its Regular cartridges at a "premium," this is irrelevant. Even if SCC's characterization of the price structure on Lexmark's cartridges were correct, then the consideration for accepting the Prebate agreement can also be classified as the forbearance of paying a premium. Either way, this is more than merely "sham" consideration and accordingly satisfies the consideration requirement of contract formation. While Lexmark's pricing scheme may (or may not) be relevant regarding other issues in this case, it is simply irrelevant here.

SCC's argument that "prebate contracts" violate the statute of frauds due to a lack of signature is equally misplaced for being premised on the notion that prebate terms are stand alone contracts. The Court agrees with Lexmark's rebuttal to this argument:

> Although UCC § 2–201(1) requires contracts for the sale of goods over $500 to be in writing, subsection (3)(c) of the same provision states that "A contract which does not satisfy the requirements of subsection (1) but which is valid in other respects is enforceable ... (c) with respect to goods for which payment has been made and accepted or which have been received and accepted." UCC § 2–201(c)(3) (enacted in Kentucky at KRS 355.2–201(c)(3)). Here, payment has been made and accepted, and the goods have been received and accepted ...[many times over].

[R. 678 at 14].

■ The case law on shrinkwrap licenses is frankly scant, especially in Kentucky. Nevertheless, Lexmark's Prebate agreement is much clearer and more reciprocal in terms than the alleged "terms of sale" considered by the Federal Circuit in

price, and customers pay a premium if they choose to use Regular cartridges. Here, however, it is the fact that the Prebate cartridge is

in fact less expensive than the Regular cartridge that is significant.

*Jazz Photo Corp. v. Int'l Trade Comm'n,* 264 F.3d 1094, 1107 (Fed.Cir.2001). In light of the patent law that "the legality of restrictive licenses 'seems clear'," the Court simply finds no reason that state contract law here would operate to invalidate the Prebate terms. *Mallinckrodt, Inc. v. Medipart, Inc.,* 976 F.2d 700, 704 (Fed.Cir.1992). While Lexmark's motives behind Prebate may (or may not) go to other issues in this case (and the Court makes no representatives either way here), Lexmark's internalized motives for Prebate simply do not impact on the objective validity of the program under contract and patent law. *If* a restrictive license has an anticompetitive effect that satisfies the criteria necessary to recover under antitrust law (or to argue antitrust as an affirmative defense), then that is likely a sufficient deterrent to prevent to alleged abuse of restrictive licenses. Accordingly, the Court finds no reason, and thinks it imprudent and simply incorrect, to intrude into uncharted waters of state contract law and declare Prebate, as an initial matter, invalid on any public policy bases.

## V. LEXMARK'S SECOND THEORY OF PATENT INFRINGEMENT: OVERSEAS SALES

Part of Lexmark's patent infringement claims are based on the theory that the first sale of cartridges in foreign nations does not exhaust Lexmark's patents on those cartridges in the United States. *See Jazz Photo Corp. v. Int'l Trade Comm'n,* 264 F.3d 1094, 1105 (Fed.Cir.2001). In *Jazz Photo,* the Federal Circuit specifically held:

> United States patent rights are not exhausted by products of foreign provenance. To invoke the protection of the

first sale doctrine, the authorized first sale must have occurred under the United States patent. Our decision applies only to [patented articles] for which the United States patent right has been exhausted by first sale in the United States.

*Id.* (citing *Boesch v. Graff,* 133 U.S. 697, 701–703, 10 S.Ct. 378, 33 L.Ed. 787 (1890)). Accordingly, Lexmark argues that regardless of whether a single use restriction reads on its cartridges, the Counterclaim Defendant remanufacturers of printer cartridges infringe upon the patents that read upon cartridges originally sold overseas by reselling them without license in the United States.

In Response to Lexmark's overseas theory of patent infringement, the remanufacturers argue that the scope of the *Jazz Photo* holding is limited and distinguishable in that it only applies to articles that are both *manufactured* and sold *entirely* overseas—i.e. "of foreign provenance." [15] [R. 648 at 9]. However, the Court finds that the dispositive consideration in determining whether patent exhaustion applies to the sale of an article is whether that article was first sold in the United States or overseas. *See Minebea Co. v. Papst,* 444 F.Supp.2d 68, 142 (D.D.C.2006). The nature of the patented article, disposable cameras, in *Jazz Photo* being "of foreign provenance" merely served as proof that those cameras' "first sales" all occurred overseas.

The remanufacturers do argue that a material question of fact exists as to whether and to what extent Lexmark's cartridges are "first sold" overseas and thus not subject to exhaustion of the U.S. patents that read on them upon the foreign

---

**15.** The remanufacturers cite *United States v. Vroman,* 975 F.2d 669, 672 (9th Cir.1992), for the proposition that *Jazz Photo* is not controlling in this case. [R. 648 at 10]. The Court

fails to see how the subject matter in *Vroman*—i.e. the constitutional sufficiency of a criminal indictment regarding tax evasion—is relevant here. *Id.*

sale. Lexmark rebuts the remanufacturers arguments with evidence that:

Lexmark has sold 6 million cartridges at issue outside the United States, 2.5 million of which were sold in the 4 countries at issue. In turn, only 345,162 or (14%) of those 2.5 million cartridges could have *even possibly* been physically transferred through the United States, but the evidence shows that title to even those cartridges did not pass in the United States [because Lexmark's supplier/distribution contracts expressly disclaim the passage of title to the cartridges to the suppliers].

[R. 687 at 14 (emphasis in original) ].

In response to Lexmark's reply, the remanufacturers filed Evidentiary Objections and Motion to Strike Exhibits Accompanying Lexmark's Reply Memorandum. [R. 780]. The remanufacturers first argue that Lexmark improperly "introduced new facts or legal arguments in a reply brief than those presented in the moving papers." [R. 780 at 3 (citation omitted) ]. The Court believes Lexmark's evidence to be entirely germane and on point to rebutting the remanufacturers' arguments in their Response at Record No. 648 that there is a material issue of fact regarding the provenance of Lexmark's cartridges, or more dispositively, where the first sales of Lexmark's cartridges took place. The remanufacturers also argue that the exhibits in support of Lexmark's reply are not authenticated and accordingly cannot be relied upon as evidence for entering summary judgment and that certain exhibits are irrelevant. However, the Court need not address the remanufacturers' arguments regarding authenticity or Lexmark's Response at Record No. 834. To the extent that the Court will deny Lexmark's Mo-

tion to the extent it seeks judgment on infringement as set forth below, the remanufacturers' argument to strike documents in support of Lexmark's reply is a moot issue, and the Motion will be denied accordingly.

## VI. NEITHER PARTY IS ENTITLED TO COMPLETE JUDGEMENT AT THIS STAGE ON PATENT INFRINGEMENT

While Lexmark, in its Motion for Summary Judgment of Direct Infringement of Nine Patents against the Remanufacturers, limits the scope of that Motion to nine patents in suit, Lexmark actually has alleged infringement with regard to fourteen patents.[16] [*See* R. 488, Attach. 2]. As a general matter, summary judgment regarding infringement of these patents is inappropriate, at least until the *Markman* hearing is held, as explained below.

### A. Lexmark is Not Entitled to Summary Judgment on Either of its Theories of Patent Infringement

Patent infringement analysis requires a two-part inquiry. *Dynacore Holdings Corp. v. U.S. Philips Corp.*, 363 F.3d 1263, 1273 (Fed.Cir.2004). First, the Court must interpret the scope and meaning of the accused claims. *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1454 (Fed.Cir. 1998) (en banc). Second, the court is required to "compare the properly constructed claims to the allegedly infringing device." *Dynacore Holdings Corp.*, 363 F.3d at 1273 (citing *Bai v. L & L Wings, Inc.*, 160 F.3d 1350, 1353 (Fed.Cir.1998)).

Lexmark currently argues that 93 claims within its nine patents at issue read on various Lexmark cartridges that the remanufacturers remanufacture, as set forth in the following manner:

---

**16.** These fourteen patents are exclusive of Lexmark's two invalid design patents, Patent Nos. D399,249 and D458,300, which are addressed earlier in this Order.

| U.S. Patent No. | Lexmark Printer Cartridges and Remanufactured Versions Thereof | | | | | | |
|---|---|---|---|---|---|---|---|
| | T420 | T52X | T62X | T63X | E320/22 | E321/23 | E220 |
| 6,487,383 | 1, 2, 6, 7, 10, 11, 15, 16, 19 | 1, 2, 6, 7, 10, 11, 15, 16, 19 | 1, 2, 6, 7, 10, 11, 15, 16, 19 | 1, 2, 6, 7, 10, 11, 15, 16, 19 | 19 | 19 | 19 |
| 6,459,876 | | 1–28 | 1–28 | 1–28 | | | |
| 6,009,291 | 1, 2 | 1, 2 | 1, 2 | 1, 2 | | | |
| 5,875,378 | 1, 14, 24 | 1, 14, 24 | 1, 14, 24 | 1, 14, 24 | | | |
| 5,802,432 | 1–3, 7–9 | 1–3, 7–9 | 1–3, 7–9 | 1–3, 7–9 | | | |
| 5,768,661 | 1, 2, 3, 6 | 1, 2, 3, 6 | 1, 2, 3, 6 | 1, 2, 3, 6 | | | |
| 5,758,233 | 1, 4 | 1, 4 | 1, 4 | 1, 4 | | | |
| 5,995,772 | 14–18, 22, 32–34 | 1–5, 7–9, 12, 14–18, 20–25, 27–28, 32–34 | 1–5, 7–9, 12, 14–18, 20–25, 27–28, 32–34 | 1–5, 7–9, 12–18, 20–25, 27–28, 32–34 | 14–18, 22, 32–34 | 14–18, 22, 32–34 | 14–18, 22, 32–34 |
| 5,634,169 | 1, 2, 4, 5, 32–36, 42 | 1–6, 32–36, 39, 42 | 1–6, 32–36, 39, 42 | 1–6, 32–36, 39, 42 | 1, 2, 4, 5, 32–36, 42 | 1, 2, 4, 5, 32–36, 42 | 1, 2, 4, 5, 32–36, 42 |

The information in this chart is taken from Dr. Charles F. Reinholtz's expert report, in which he gives his opinion that, *inter alia*, the above patents cover the toner cartridges as set forth above. [R. 519 at 33 and Exhibit 1]. Lexmark offers Dr. Reinholtz's report as its prima facie evidence of infringement.

Rather than even making a cursory argument that Dr. Reinholtz was wrong in his determination that the nine patents read as listed above on the accused cartridges, the remanufacturers simply argue that Dr. Reinholtz's opinion is conclusory and therefore, cannot be relied upon to sustain summary judgment in Lexmark's favor. The Court disagrees. Dr. Reinholtz lists each element of the above claims, construes the limitation of that claim element based on his expertise—the remanufacturers do not contend that Dr. Reinholtz is not qualified as a patent expert in their Response at Record No. 648—and then concludes whether a certain cartridge satisfies that claim limitation. Contrary to the remanufacturers contention, for Dr. Reinholtz to find that a car-

tridge brand satisfies a particular claim limitation is not conclusory; rather, it is merely drawing a conclusion. Dr. Reinholtz outlines the materials he reviewed in making his analyses. [R. 519, Ex. 1, ¶ 12–26]. Thereafter, the Court thinks it crystal clear that Dr. Reinholtz compared his construction of claim elements with the accused cartridges to determine whether the limitation of a particular element was satisfied. In short, "[t]he report is sufficient to establish the reasoning underlying the conclusion[s]." *Vollmert v. Wis. Dep't of Transp.*, 197 F.3d 293, 300–01 (7th Cir. 1999).

The Counterclaim Defendants do not remotely suggest, specifically in their Response, that they will be prepared to challenge Dr. Reinholtz's conclusions at trial. Rather, the remanufacturers merely aver that Lexmark has yet to "identify each independent and dependent claim that Lexmark contends is infringed ... and then produce engineering drawings and specifications," as step one of a four-step discovery process initiated by Magistrate Order dated April 5, 2006 requires. [R.

268]. The Court would merely point out to the remanufacturers (1) the chart that this Court has reproduced above, a copy of which was at the latest provided to counsel for SCC by letter dated June, 22, 2006 [R. 488, Attach. 2]; and (2) that the Court has specifically ruled that Lexmark has in fact satisfied step one of the four-step process. [R. 361 at 5, *aff'd,* R. 660].

Despite the failings of the remanufacturers' Response to Lexmark's Motion [R. 648], the Court still believes that summary judgment in Lexmark's favor is inappropriate, though judgment as a matter of law may (or may not) be appropriate at a later time. While the Court is under no obligation to root through the massive files of this case (almost 1,000 docket entries in Case No. 5:04–84 alone) in search of an issue of material fact for the remanufacturers, what is evident in the record is that the parties are in dispute over the construction of many claims. [*See* R. 919, 938, 949]. Therefore, even though Dr. Reinholtz's conclusions were not "conclusory," his conclusions are based upon his own constructions of the claim limitations. To the extent those constructions are challenged prominently in the record, there is a material issue of fact precluding summary judgment for Lexmark *at least* until after the claim construction hearing. *See generally Markman v. Westview Instruments,* 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996).

### B. The Counterclaim Defendants are Not Entitled to Summary Judgment Regarding Patent Infringement Pursuant to their Affirmative Defense of Patent Misuse

 The Court now considers SCC's Motion for Summary Judgment to Preclude Lexmark International, Inc. from Enforcing its Patents Because of Lexmark's [Alleged] Patent Misuse.[17] [R. 520]. For the reasons that follow, SCC's Motion will be denied. SCC's Motion is based on the fact that in addition to producing new cartridges for its printers, Lexmark is a remanufacturer of its own used cartridges. When Lexmark collects used cartridges for remanufacture, some of those cartridges are Regular cartridges on which Lexmark's patent rights have been exhausted by an original, unrestricted sale of that cartridge in the United States. However, it is undisputed that during the remanufacturing process, Lexmark brands cartridges that previously did not contain the Prebate licensing agreement with the single-use restriction. SCC argues that it is patent misuse for Lexmark to purportedly extend its right to restrict the use of any given cartridge under patent law after Lexmark's patent rights in that cartridge has been exhausted.

#### 1. Patent Misuse Cannot be Found as a Matter of Law in the Current Instance

As the reader will recall from the Court's consideration of "permissible repair" above, "[t]he unrestricted sale of a patented article, by or with the authority of the patentee, 'exhausts' the patentee's right to control further sale and use of that article by enforcing the patent under

17. The Court recognizes that the Counterclaim Defendants have also alleged as an affirmative defense to patent infringement that the nature and execution of Lexmark's Prebate program constitutes an antitrust violation. This is additional to the Counterclaim Defendant remanufacturers maintaining antitrust causes of action in this case. Antitrust, whether as a cause of action or affirmative defense, is considered in a separate order.

which it was first sold." *Jazz Photo Corp. v. Int'l Trade Comm.*, 264 F.3d 1094, 1105 (Fed.Cir.2001). This "patent exhaustion" is also sometimes referred to as the "first sale" doctrine. *Id.* "The theory behind this rule is that in such a transaction, the patentee has bargained for, and received, an amount equal to the full value of the goods." *B. Braun Med. v. Abbott Lab.*, 124 F.3d 1419, 1426 (Fed.Cir.1997) (citation omitted). Pursuant to this doctrine, Lexmark's original, domestic, unrestricted sale of a cartridge "exhausts" Lexmark's right to control further use of the cartridge by enforcing its patents which read on the cartridge when first sold. As such, third party remanufacturers may collect, repair, and resell used Lexmark toner cartridges that were originally sold unconditionally in the United States.

 In evaluating the practice of turning Regular cartridges into Prebate cartridges during the remanufacturing process, the Court relies upon a body of patent misuse law that the Court of Appeals for the Federal Circuit has largely defined. Patent misuse is an equitable defense to claims of patent infringement, "whereby a court of equity will not lend its support to enforcement of a patent that has been misused." *B. Braun Med.*, 124 F.3d at 1427.

> When a practice alleged to constitute patent misuse is neither per se patent misuse nor specifically excluded from a misuse analysis by § 271(d), a court must determine if that practice is "reasonably within the patent grant, i.e., that it relates to subject matter within the scope of the patent claims." *Mallinckrodt, Inc. v. Medipart, Inc.*, 976

F.2d 700, 708, 24 U.S.P.Q.2D (BNA) 1173, 1179–80 (Fed.Cir.1992). If so, the practice does not have the effect of broadening the scope of the patent claims and thus cannot constitute patent misuse. *Id.*, 976 F.2d 700, 24 U.S.P.Q.2D (BNA) at 1180. If, on the other hand, the practice has the effect of extending the patentee's statutory rights and does so with an anti-competitive effect, that practice must then be analyzed in accordance with the "rule of reason." *Id.* Under the rule of reason, "the finder of fact must decide whether the questioned practice imposes an unreasonable restraint on competition, taking into account a variety of factors, including specific information about the relevant business, its condition before and after the restraint was imposed, and the restraint's history, nature, and effect." *State Oil Co. v. Khan*, 522 U.S. 3, 118 S.Ct. 275, 279, 139 L.Ed.2d 199 (1997) (citing *Arizona v. Maricopa County Med. Soc.*, 457 U.S. 332, 343 & n. 13, 102 S.Ct. 2466, 73 L.Ed.2d 48 (1982)).

*Va. Panel Corp. v. MAC Panel Co.*, 133 F.3d 860, 869 (Fed.Cir.1997).[18] As SCC points out, patent "misuse may arise when the conditions of antitrust violation are not met." *C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d 1340, 1372 (Fed.Cir.1998) (citing *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 140–41, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969)); *see also B. Braun Med. v. Abbott Lab.*, 124 F.3d 1419, 1426 (Fed.Cir.1997) ("The patent misuse doctrine . . . is a method of limiting abuse of

---

**18.** The Federal Circuit coined the phrase "relates to subject matter within the scope of the patent claims" in 1992 in *Mallinckrodt* without defining what the phrase entails, and the phrase has gone on to be cursorily repeated without elaboration in various cases. However, the language used in *Virginia Panel Corp.*,

*supra*, enables the Court to define the phrase in the negative. A practice does not "relate[ ] to subject matter within the scope of the patent claims" if "the practice has the effect of extending the patentee's statutory rights and does so with an anti-competitive effect." *Va. Panel Corp.*, 133 F.3d at 869.

patent rights separate from the antitrust laws").

Lexmark's practice of stamping originally-unconditionally-sold (in the United States), used cartridges with the Prebate label has never been found to be per se patent misuse. The Supreme Court has never addressed a situation like this, and per se misuse has traditionally applied to situations of, *e.g.*, tying arrangements and price fixing. *See, e.g., Morton Salt Co. v. G.S. Suppiger Co.*, 314 U.S. 488, 62 S.Ct. 402, 86 L.Ed. 363 (1942) (regarding tying) (However, by operation of 35 U.S.C. § 271(d)(5), the tying patentee must also have market power for the infringer to succeed on the equitable defense of misuse); *U.S. Gypsum Co. v. Nat'l Gypsum Co.*, 352 U.S. 457, 77 S.Ct. 490, 1 L.Ed.2d 465 (1957) (price fixing). Whether misuse is per se or not, the common link between all misuse cases is that the "licensor purports to enlarge the licensee's obligations beyond the limits of the patent grant." *USM Corp. v. SPS Technologies, Inc.*, 694 F.2d 505, 511 (7th Cir.1982).

The preliminary issue for the Court then is whether Lexmark stamping used Regular cartridges with the Prebate label for the first time in the remanufacturing process is "reasonably within the patent grant." Lexmark argues that "when Lexmark reacquires the non-Prebate or IBM-branded cartridges it also reacquires the patent rights that it has previously given to the purchaser of the cartridge." The argument is inapposite to the very idea of patent *exhaustion*, and accordingly Lexmark can point to no case law to support its theory. For Lexmark's argument to succeed, a cartridge user would first have to own Lexmark's patent rights in a given cartridge before the user would have anything to transfer back to Lexmark. Rather, the user essentially possesses, as Lexmark itself argues, a promise from Lexmark not to sue on its intellectual property rights. [R. 618 at 19]. Accordingly, all Lexmark can "reacquire," when speaking in terms of intellectual property, from the user of the cartridge sold unconditionally is a promise not to sue itself. Lexmark's application of general property transfer principles to intellectual property in this instance simply ignores patent law, especially the law of exhaustion.[19]

The Court thinks it clear that stamping Prebate on cartridges as a means of enforcing patent rights that have indisputably been exhausted by prior unconditional sale of the same cartridges in the United States is outside the patent grant. Such practice is protectionist of rights that no longer exist in the specific article sold. What the Court cannot find as a matter of law, however, is whether "the questioned practice imposes an unreasonable restraint on competition." To wit, "a factual determination must reveal that the overall effect of the license tends to restrain competition unlawfully in an appropriately defined relevant market." *Mallinckrodt, Inc. v. Medipart, Inc.*, 976 F.2d 700, 706 (Fed.Cir.1992). Lexmark merely doing something "wrong" in a vague sense is not grounds for a successful assertion of the misuse defense, an

---

**19.** Of course, Lexmark can assert ownership rights in the cartridges it reacquires under normal contract law and property ownership principles. However, Prebate is specifically a means for Lexmark to enforce its patent rights; Prebate is after all the basis for Lexmark's domestic patent infringement claims, and the agreement itself on cartridge boxes references the *"patented* Return Program cartridge" inside. (emphasis added). Accordingly, that which may be permissible under contract law alone may nevertheless run afoul of patent or other areas of law. *Mallinckrodt, Inc. v. Medipart, Inc.*, 976 F.2d 700, 708 (Fed. Cir.1992) (citing *United States v. Univis Lens Co.*, 316 U.S. 241, 62 S.Ct. 1088, 86 L.Ed. 1408 (1942)).

equitable defense, to patent infringement. *C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d 1340, 1373 (Fed.Cir.1998). Without a finding by the jury that Lexmark's practices during the remanufacture of Regular domestic cartridges "unreasonably restrain competition," there can be no misuse. For that reason, SCC's motion must be denied.[20]

### 2. The Method Patent Claims Referenced by Lexmark are Not a Defense to Misuse

In support of a position that SCC's patent misuse defense is unavailable as a matter of law, Lexmark also argues that certain method patent claims read on its cartridges, and the Federal Circuit, Lexmark argues, has ruled that the exhaustion doctrine does not apply to method claims. Lexmark's method patent claims "cover the steps performed by the printers during use in order to determine: (1) the quantity of toner in the cartridges and (2) the characteristics of the toner cartridges." [R. 618 at 26]. Accordingly, the argument goes, conditioning the sale of remanufactured Regular cartridges with the Prebate label is within the patent grant of Lexmark's unexhausted method claims.

 Lexmark is correct that the Federal Circuit has ruled "the sale of a device does not exhaust a patentees's rights in its method claims," but Lexmark interprets the applicability of that holding in an overly broad, per se manner. *LG Elecs., Inc. v. Bizcom Elecs., Inc.*, 453 F.3d 1364, 1370 (Fed.Cir.2006) (citing *Glass Equip. Dev., Inc. v. Besten, Inc.*, 174 F.3d 1337, 1341 n. 1 (Fed.Cir.1999)). Federal Circuit case law, in order to be read consistently, requires that method claims are exhausted by the unconditional sale of an article un-

der some circumstances, namely if the original sale of the article implies a unconditional license to use those methods with regard to that article. In *Jazz Photo Corp*, the Federal Circuit noted the exhaustion of method (or process) claims upon an unconditional first sale:

> The defense of repair is applicable to process claims, as well as to apparatus claims, when the patented process was used in the United States and the patent right has been exhausted for the articles produced thereby. *Cf. Hewlett–Packard*, 123 F.3d at 1455, 43 U.S.P.Q.2D (BNA) at 1659 ("When a patentee sells a device without condition, it parts with the right to enforce any patent that the parties might reasonably have contemplated would interfere with the use of the purchased device.") Thus when the same process was used, the patent right for that process was exhausted upon the [article's] first sale in the United States. Again, however, for respondents who refused to provide evidence to show the methods they were practicing, we have no basis on which to reverse the Commission's judgment.

264 F.3d at 1108–1109; *cf. Met–Coil Systems Corp. v. Korners Unltd., Inc.*, 803 F.2d 684, 687 (Fed.Cir.1986) ("A patent owner's unrestricted sales of a machine useful only in performing the claimed process and producing the claimed product 'plainly indicate that the grant of a license should be inferred.' ").

In *LG Electronics, Inc.*, the statement "the sale of a device does not exhaust a patentee's rights in its method claims" cannot include those instances when there is an implied license to use the patented methods that read on, and with regard to,

---

20. Suffice it to say, SCC is not entitled to summary judgment. Left for later determination is whether SCC has evidence necessary for a reasonable trier of fact to be able to

come to the conclusion that Lexmark's aforementioned practice "unreasonably restrains competition."

an article sold unconditionally. The cases cited in *LG Electronics, Inc.* to support the holding therein involve two situations unlike the situation at bar: In *Bandag, Inc. v. Al Bolser's Tire Stores, Inc.*, 750 F.2d 903, 923 (Fed.Cir.1984), the method patent did "not . . . combine 'the features of both a process and an apparatus patent'," and could not be "read on the equipment [the alleged infringer] used in its" allegedly infringing processes. Next, in *Glass Equipment Development, Inc. v. Besten, Inc.*, the Federal Circuit dealt with a situation in which the patentee had an apparatus claim on spacer frame assemblies and a method claim on the construction of those spacer frame assemblies. 174 F.3d 1337 (Fed.Cir.1999). In that case, a manufacturer bought and used unpatented corner keys sold by the patentee's licensee to assemble spacer frames in a manner that did not infringe on the patentee's method claim. Later, the defendant sold equipment to the manufacturer for the purpose of making spacer frames in a manner that did infringe on the patentee's method claim. Under those circumstances, the sale of an unpatented article did not "grant[ ] an implied license to practice one or more methods claimed in a separate patent," especially since the manufacturer used the unpatented corner keys for some time in a manner that did not infringe the method claim. *Id.* at 1342 n. 1. The common feature of these two cases is that "the sale of a device cannot exhaust the patentee's rights under a *separate* patent teaching a method of accomplishing a specific function." *LG Elecs., Inc. v. Asustek Computer, Inc.*, 248 F.Supp.2d 912, 918 (N.D.Cal.2003) (emphasis added), *rev'd in part on other grounds and aff'd in part sub nom., LG Elecs., Inc. v. Bizcom Elecs., Inc.*, 453 F.3d at 1370 ("The [district] court

was correct" in its holding regarding method patents and exhaustion.).[21]

▮▮▮ Unlike the above cases, here the methods are so intertwined with the use of the licensed patented article itself that denying a license in the method claims to a user would deprive the user of his non-infringing, bargained-for use of the toner cartridge. Simply put, Lexmark's method claims are not separate patents. For instance, in Lexmark's '772 Patent, Lexmark's 39 method claim is dependent on its 33 apparatus claim. [R. 618, Exhibit 1 (last page) ]. Given the nature of the method claims, which in part cover "the steps performed by the printers during use in order to determine . . . the quantity of toner in the cartridges," the Court is not so sure that a licensed cartridge user could avoid the patented process, even if he tried. If method claims cannot as a practical matter be severed from a license to use a patented article, then a license for the user to engage those methods ought to be inferred. To hold that method claims are *always* exempt from the first sale/exhaustion doctrine would be the promulgation of an *ipse dixit* rule void of rationale, and accordingly, the Federal Circuit case law, in light of cases like *Jazz Photo Corp.* and *Met–Coil Systems Corp.*, ought not be construed to hold such.

For these reasons, the Court finds that because Lexmark's method claims are not separate patents from its apparatus claims, which are subject to exhaustion,—or at least that the method claims should not be read apart from the apparatus claims in this instance—the method claims referred to by Lexmark too are subject to patent exhaustion.

**21.** Also worthy of note is that in the typical case in which a method claim is not exhausted by the sale of an article, the method, unlike here, is a process for the creation (or construction) of that article.

### 3. Lexmark's Incorporation of New Patented Components into Remanufactured Cartridges is Not a Defense to Misuse

▆▆▆ Lexmark also argues that during the remanufacturing process, replacing some old components with new components on which Lexmark carries patents gives Lexmark the right to condition the resale of the entire cartridge with Prebate, because the first sale doctrine has not yet caused exhaustion of the patents in those newly-added components. [R. 618 at 32]. Lexmark does not mention any legal authority for this argument, and the Court need only briefly address it by taking the argument to its illogical conclusion. If Lexmark can condition the sale of a remanufactured cartridge on which it has no patent rights due to first sale exhaustion with Prebate by replacing an old component with a new patented component, then the remanufacturing Counterclaim Defendants in this case ought to be able to do the same. Assuming, for example, a remanufacturer like Pendl has its own patent on a component that it incorporates into remanufactured Lexmark cartridges, then under Lexmark's theory, Pendl would be able to stamp its own version of Prebate on the remanufactured cartridges—after all, the only non-exhausted patent that would apply to any part of the cartridge would be Pendl's freshly-incorporated one. The point is, exhaustion occurs on a cartridge-by-cartridge (or article-by-article) basis and cannot be broken down into a component-by-component basis.

### 4. SCC is Not Entitled to Judgment on its Additional Theories of How Lexmark Allegedly Commits Patent Misuse

Contrary to SCC's assertion, the Court seriously doubts that Lexmark's incorporation of unpatented microchips and unpatented toner into its cartridges is a tying arrangement that amounts to patent misuse, because the Court doubts that said components are "staple" or separate products or anything other than components of a cartridge. Suffice it to say, SCC has not presented evidence necessary to grant it summary judgement on this point. [R. 520 at 21–22].

SCC also takes exception to Lexmark allegedly imposing an affirmative duty on consumers through Prebate to return used cartridges to Lexmark. SCC does not explain how this alleged requirement "impermissibly broaden[s] the scope of the patent grant with anticompetitive effect" other than stating so *ipse dixit*. *C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d 1340, 1372 (Fed. Cir.1998) (citing, *inter alia*, *Va. Panel Corp. v. MAC Panel Co.*, 133 F.3d 860, 868 (Fed.Cir.1997)). However, as noted above, the Court finds no affirmative obligation on the part of Lexmark cartridge consumers to return Prebate cartridges to Lexmark. On the one hand, the Prebate language printed on toner cartridge boxes, which states, "return the empty cartridge only to Lexmark," could be a positive requirement to return the cartridge to Lexmark when finished. Alternatively, the language could be construed to mean that if the user returns the cartridge to anyone, the cartridge must be returned to Lexmark; however, the user has the option of also throwing the cartridge away or retaining it for whatever reason. Since [agreements resembling] contracts of adhesion are construed against the drafter, the latter interpretation controls. *Ky. Lottery Corp. v. Casey*, 862 S.W.2d 888, 889 (Ky. 1993) (citation omitted).

### C. Lexmark's Patent No. 6,300,025, Pertaining to Photoconductive Drums

Notwithstanding the general analysis regarding patent infringement above, one discrete issue remains regarding the Coun-

terclaim Defendant remanufacturers' alleged direct infringement with regard to Lexmark's Patent No. 6,300,025 (the " '025 Patent"), a chemical patent related to photoconductive drums used in Lexmark's cartridges.[22] Specifically, Pendl's Motion for Partial Summary Judgment of Non–Infringement of Replacement Photoconductive Drums [R. 521] is before the Court for consideration, as well as MSE's similar Motion for Partial Summary Judgment of Non–Infringement of Replacement Photoconductive Drums and of Non–Infringement of Lexmark's '025 Patent. [R. 562]. For the reasons set forth below, both motions will be granted.

In their current Motions, Pendl and MSE ask for the same summary judgment relief, namely an adjudication that those companies' replacement photoconductive drums, as opposed to the reuse of Lexmark's drums, do not infringe on the '025 Patent. MSE asks for the additional relief of adjudication of non-infringement of Lexmark's '025 Patent, because MSE contends that it always replaces the photoconductive drum in remanufactured cartridges, as opposed to reusing Lexmark's drums.

### 1. *Replacement* Photoconductive Drums Do Not Infringe the '025 Patent

First, Pendl and MSE (the "remanufacturers") both seek judgment that the use of replacement photoconductive drums—as opposed to reusing old Lexmark drums—in remanufactured printer cartridges does not infringe on Lexmark's '025 Patent. MSE and Pendl argue that "Lexmark has no evidence that [the remanufacturers'] replacement photoconductive drums infringe U.S. Patent No. 6,300,025." [R. 521 at 4, ¶ 10]. Additionally, Lexmark's own expert "testified that if a remanufacturer replaces

the photoconductive drum with a photoconductive drum that is not covered by the '025 patent, then the remanufactured cartridge would not infringe the '025 patent." *Id.* at 4, ¶ 7. Essentially, the remanufacturers argue that Lexmark cannot meet its burden of proof that the remanufacturer's replacement drums infringe its '025 Patent.

Lexmark responds to the remanufacturers' argument that replacement drums do not infringe on the '025 Patent by arguing that (1) reuse of Lexmark's drums infringes on the '025 Patent and (2) there is an issue of material fact as to whether or not the remanufacturers reuse Lexmark drums. Regarding the issue of whether *replacement* drums, rather than reusing Lexmark drums, infringe on the '025 Patent, Lexmark completely misses the point. Assuming *arguendo* that a remanufacturer's reuse of Lexmark's drums infringes on the '025 Patent and that the remanufacturers to some extent reuse Lexmark's drums, what does not follow is that the use of *replacement* drums likewise infringes. On the point of whether replacement drums infringe on Lexmark's '025 Patent, Lexmark's own response makes clear that it has no evidence to carry its burden of proving infringement on this issue. This is where Pendl's Motion ends. Pendl does not refute that sometimes it reuses Lexmark's drums, but the point of Pendl's Motion is to establish that when it does replace the original drum, it does not infringe on the '025 Patent.

### 2. MSE's Practice of Replacing Photoconductive Drums when Remanufacturing Lexmark Cartridges

Unlike Pendl, MSE's Motion goes further to argue that it *always* replaces the

---

**22.** This is one of Lexmark's sixteen patents in suit (fourteen, if excluding Lexmark's two design patents) but is not one of the nine patents on which Lexmark seeks summary judgment on direct infringement at Record No. 519. [R. 488, Attach. 2; R. 519 at 33].

photoconductive drum on the Lexmark cartridges it remanufactures. Accordingly, MSE seeks summary judgment in its favor regarding all issues of infringement concerning the '025 Patent. The only evidence that Lexmark presents to rebut MSE's claim is that MSE's "Build Instructions," which are essentially specifications for remanufacturing a given cartridge, state in one bullet point regarding the remanufacture of a cartridge's "Waste hopper section," "Install an approved OPC [organic photo-conductor] drum (install the axle from the small helical gear side, be sure to use new white Teflon bushings) when using OEM drums the gears must be re-glued using epoxy glue." [sic], [Exs. at R. 614 (The files on CD containing the Court's copy of these exhibits are labeled Exhibits 9 through 15; however, the exhibit stickers on the PDF documents themselves are labeled Exhibits SS-2 through SS-8) ]. OEM is a common abbreviation for "original equipment manufacturer." Accordingly, when speaking of OEM drums in Lexmark cartridges, those drums are made by Lexmark and covered by the '025 patent. Lexmark argues that this indirect evidence is sufficient to create an issue of material fact as to whether MSE ever reuses Lexmark drums. The Court disagrees.

At most, this evidence is the "mere scintilla" that the Supreme Court has warned will not be sufficient to overcome a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). First, the document upon which Lexmark relies is instructional, not directional in nature. Accordingly, it does not necessarily follow that the statement "when using OEM drums the gears must be re-glued using epoxy glue" in fact means that MSE does use OEM drums when remanufacturing Lexmark cartridges. To the extent that the segment could serve as indirect evidence of OEM drum reuse, the inference is

too great for a reasonable jury to find that MSE ever reuses original Lexmark drums based on that evidence alone. Other than this scintilla of indirect evidence, Lexmark presents nothing to suggest that MSE reuses OEM drums. To the contrary, there is evidence in the form of sworn testimony from MSE's president that MSE "has always replaced every photo-conductive drum when it remanufactures" cartridges. [R. 562, Ex. "E"].

MSE also argues that the Build Instructions, in the "approved components" section/chart, "state unambiguously that MSE uses '1' new drum for every cartridge it remanufactures, while other parts are only replaced 'as needed.'" [R. 675 at 3; *see also, e.g.,* R. 614, Ex. 9, a/k/a Ex. SS–2, p. 2]. The Court agrees that the "approved components" chart supports MSE's position, but not for the reason stated by MSE. The "as needed" parts are all components that cannot be a numerical whole. To wit, while a person can have one drum, a person cannot have one "putty", "grease," or "tape." Therefore, MSE employees are to use putty, grease, and tape, for instance, "as needed." Concerning the use of "1" drum, the column of the "approved components" chart indicating the quantity to use does not indicate whether that drum must be new or can be used. Nevertheless, in the "Item desc./vendor" column, all but one of MSE's Build Instructions for various Lexmark cartridges list companies other than Lexmark, the OEM, as the vendor of the "approved" drum. [*See, e.g.,* R. 614, Ex. 9, a/k/a Ex. SS–2, p. 2]. Concerning the Build Instructions for cartridges fitting Lexmark's T420 printers, the vendors of approved drums are listed as "Lex. Ortra T420 / Fuji." [R. 614, Ex. 11, a/k/a Ex. SS–4, p. 2]. While it is ambiguous as to whether this could mean that the OEM drum, made by Lexmark, is approved for reuse, everywhere else where an OEM component is the ap-

proved component, "OEM" is expressly listed as the "vendor," suggesting that the approved drum for T420 cartridge remanufacturing is not the OEM drum.

While the Court has evaluated evidence presented by MSE, ultimately it is the duty of Lexmark to present more than a single bit of insubstantial evidence in order for a reasonable jury to conclude that MSE reuses, even if only sometimes, Lexmark drums in its remanufacturing process. The Court would note that Lexmark was able to show direct evidence, in the form of employee testimony, that both NER and Pendl reuse Lexmark drums when remanufacturing at least some of the time or on occasion. [R. 614 at 5]. If MSE does ever reuse Lexmark OEM drums, which appears unlikely, Lexmark has simply failed to sufficiently investigate during discovery MSE's remanufacturing process to support its claim in front of a jury.

## VII. CONCLUSION

For the reasons set forth herein, it is hereby **ORDERED** as follows:

(1) SCC's Motion for Leave to File Excess Pages [R. 642] is GRANTED, and the Clerk is directed to file the Reply tendered therewith;

(2) Lexmark's Motion for Summary Judgment of Direct Infringement of Nine Patents Against the Remanufacturers [R. 519] is **GRANTED in part and DENIED in part** as follows:

(a) The Counterclaim Defendants having failed to demonstrate evidence of the invalidity of Lexmark's patents currently at issue, U.S. Pat. Nos. 6,487,383; 6,459,876; 6,009,291; 5,875,378; 5,802,432; 5,768,661; 5,758,233; 5,995,772; and 5,634,169, and the claims therein, are **ADJUDGED VALID**, except that this adjudication only pertains to those claims of said nine patents alleged by Lexmark to read on its accused cartridges, as set forth at Record No. 519, Attachment 1, p. 33;

(b) Absent the success of affirmative defenses, such as patent misuse and antitrust, which are issues for resolution at trial, Lexmark's Prebate license is a valid, single-use, patent license; Lexmark's Prebate licenses do not fail as contrary to or inconsistent with state contract law; and

(c) Lexmark is not entitled to summary judgment on direct patent infringement;

(3) Because the Court has denied Lexmark summary judgment on patent infringement when considering Lexmark's Motion at Record No. 519, the Remanufacturers' Evidentiary Objections and Motion to Strike Exhibits Accompanying Lexmark's Reply Memorandum in Support of Lexmark's [said] Motion [R. 780] is **OVERRULED** and **DENIED as MOOT**;

(4) SCC's Motion for Partial Summary Judgment that There are No Prebate/Return "Contracts" Because Lexmark Cannot Show any Meeting of the Minds [R. 511] is **DENIED**;

(5) Regarding Lexmark's Design Patents, it is **FURTHER ORDERED** as follows:

(a) SCC's Motion for Summary Judgment for Non-Patentability and Invalidity of Lexmark's Design Patents [R. 488] is **GRANTED**;

(b) U.S. Patent Nos. D399,249 and D458,300 are **INVALID**; and

(c) Due to the invalidity of U.S. Patent Nos. D399,249 and D458,300, the Court **ADJUDGES** that neither SCC nor any other party can be liable for infringing or actively inducing the infringement of said patents;

(6) Pendl and Wazana/MSE's Motions for Partial Summary Judgment of Permissible Repair [Record Nos. 523 and 565] are both **GRANTED** as follows: it is **AD-**

JUDGED that Pendl and MSE's remanufacture of Lexmark cartridges is not "reconstruction," as defined by the Court of Appeals for the Federal Circuit in *Jazz Photo Corp. v. Int'l Trade Comm'n*, 264 F.3d 1094 (Fed.Cir.2001);

(7) Because SCC's patent misuse equitable defense must be evaluated, at the least, pursuant to the so-called "rule of reason," which presents a question of fact, SCC's Motion for Summary Judgment to Preclude Lexmark International, Inc. from Enforcing its Patents Because of Lexmark's Patent Misuse [R. 520] is **DENIED**; and

(8) With regard to Lexmark's claim of direct infringement of U.S. Patent Number 6,300,025 (the " '025 Patent"), a chemical patent related to photoconductive drums used in Lexmark's cartridges, it is **FURTHER ORDERED** as follows:

(a) Pendl Companies, Inc.'s Motion for Partial Summary Judgment of Non–Infringement of Replacement Photoconductive Drums [R. 521] is **GRANTED**;

(b) for the sole reason that Lexmark has shown no evidence to carry its burden of proving that the counterclaim-defendant remanufacturers' replacement photoconductive drums, rather than reused original Lexmark drums, infringe on the '025 Patent, it is hereby **ADJUDGED** that MSE and Pendl's *replacement* photoconductive drums do not infringe on Lexmark's '025 Patent;

(c) MSE's Motion for Partial Summary Judgment of Non–Infringement of Replacement Photoconductive Drums and of Non–Infringement of Lexmark's '025 Patent [R. 562] is **GRANTED**; and

(d) Lexmark's claim of infringement of U.S. Patent Number 6,300,025 against Wazana Brother International is **ADJUDGED** in favor of Wazana Brothers

International, Inc. d/b/a Micro Solutions Enterprises.